UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARKIAN GAVRIILVICH KUZNETSOV,

        Plaintiff,

v.

OFFICER ZAMRIPPA,
OFFICER ORTIZ,
OFFICER CARLSON, and
OFFICER BARTELL,

        Defendants.

Case No. 2:20-cv-01942-AR

OPINION AND ORDER

_____

**ARMISTEAD, Magistrate Judge**

    Plaintiff Markian Kuznetsov is an adult in the custody of Oregon Department of Corrections and held at Eastern Oregon Correctional Institution (EOCI). Kuznetsov, who is representing herself, brings this civil rights action under 42 U.S.C. § 1983 against four defendants, all of whom are correctional officers at EOCI. Kuznetsov alleges that defendants used excessive force against her and failed to intervene, violating her Eighth Amendment rights.

Page  1  – OPINION AND ORDER

Compl. 4, ECF 2. Defendants move for summary judgment on Kuznetsov's claims. Mot., ECF 24. For the reasons provided below, the court GRANTS defendants' motion for summary judgment.

## PRELIMINARY PROCEDURAL MATTER

Kuznetsov filed this action on November 9, 2020. Compl., ECF No. 2. Defendants moved for summary judgment on December 13, 2021. Defs. Mot. Summ. J., ECF No. 24. The following day, the Magistrate Judge John V. Acosta issued the following notice to Kuznetsov:

> The defendants have made a motion for summary judgment (Motion for Summary Judgment [24]) by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case.
>
> Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine dispute of material fact--that is, if there is no real dispute about any fact that would affect the result of your case--and the party who asked for summary judgment is entitled to judgment as a matter of law. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials, as provided in Rule 56(c), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine dispute of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial.

Summ. J. Advice Notice, ECF No. 25. The court instructed Kuznetsov to file a response by January 13, 2022. On December 22, 2021, Kuznetsov filed a motion for appointment of counsel and a response to the summary judgment motion, which was unaccompanied by any exhibits. ECF Nos. 26 & 27. In a January 5, 2022 Order, Judge Acosta denied Kuznetsov's fourth motion to appoint counsel, finding that she had not established exceptional circumstances. Order, ECF

Page 2 – OPINION AND ORDER

No. 30.

On February 9, 2022, Kuznetsov filed a motion to withdraw consent, and a motion for extension of time to file a response to the pending summary judgment motion. ECF Nos. 31 & 32.[1] On February 10, 2022, the court granted Kuznetsov's motion for extension of time and her request for copies of hard copies of the relevant pleadings. Order, ECF No. 33. On March 23, 2022, this case was reassigned to this court.

On May 5, 2022, the court granted Kuznetsov's second motion for extension of time to respond to the summary judgment motion, giving her until July 5 to file a response, and denied her request for a copy of the record explaining that the court previously provided her with a set of the pertinent filings. Order, ECF No. 38. On June 1, 2022, the court granted defendants' motion to stay discovery, noting that the deadline for completing discovery passed on December 13, 2021. Order, ECF No. 40. Kuznetsov does not appear to have requested any discovery in this case until May 2022, a year and half after filing her complaint, and five months after discovery closed. Despite being given six months of additional time to respond to the summary judgment motion, Kuznetsov did not file any supporting documentation, and did not ask to reopen discovery.

Defendants' version of events is supported by declarations of EOCI officers and official records from EOCI related to the events in question. *See id.* at 13-46. Kuznetsov's complaint in this action is unverified,[2] which means that the court may not treat the complaint as an affidavit

---

[1]   On October 5, 2022, District Judge Karin J. Immergut issued an Order (ECF No. 45) denying Kuznetsov's Motion to Withdraw Consent.

[2]   A verified complaint is filed with a sworn statement declaring that, under penalty of

Page 3 – OPINION AND ORDER

opposing the defendants' motion for summary judgment. *See Wickizer v. Crim*, No. 3:18-CV-01816-AC, 2022 WL 543073, at *1 (D. Or. Feb. 2, 2022), *adopted*, 2022 WL 541510 (D. Or. Feb. 23, 2022)  (citing *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985) (an unverified complaint is insufficient to counter a summary judgment motion supported by affidavits)); *Schroeder v. McDonald*, 55 F.3d 454 (1995) ("A verified complaint may be used as an opposing affidavit under Rule 56."). Thus, the following facts are based primarily on defendants' evidence, and the court considers them undisputed given Kuznetsov's failure to submit oppositional evidence.

## FACTUAL BACKGROUND

In this use-of-force case, the parties agree that defendants used force against Kuznetsov but disagree as to what types of force were used and why. On September 7, 2019, defendants Carlson and Ortiz escorted Kuznetsov from her cell in the disciplinary segregation unit (DSU) to the recreational yard enclosure. Ortiz Decl. ¶ 5, ECF No. 24. Kuznetsov's hands and ankles were handcuffed for the transfer. Bartell Decl. ¶ 6, ECF No. 24. During the escort, Kuznetsov asked about what exercise equipment she would be permitted to use in the yard. Ortiz Decl. ¶ 5; Carlson Decl. ¶ 5, ECF No. 24. When Carlson informed Kuznetsov that, due to her "incentive level," she would be placed in a plastic-covered yard cell and could not have equipment, Kuznetsov became agitated and refused to continue walking unless provided with yard equipment. Carlson Decl. ¶ 5. Carlson told Kuznetsov that her options were to go to the yard or return to her cell. *Id.* Defendant Bartell, who was sitting at the sergeant's desk, overheard the

---

perjury, the allegations are true and correct in accordance with 28 U.S.C. § 1746.

argument and walked over. Bartell ¶ 5. Bartell denied that he told Kuznetsov she could use the equipment and instructed Kuznetsov to go to the yard enclosure or walk back to her cell. *Id.* ¶ 5. Carlson said he would return Kuznetsov to her cell, and Kuznetsov replied, "fine, then you guys can carry me," and sat on the ground and refused to stand. *Id.*

Carlson and Bartell directed Kuznetsov to stand and moved toward her to assist Kuznetsov to her feet, at which point she became combative and kicked out at defendants, striking Carlson just below the knee. Carlson Decl. ¶ 6. Kuznetsov continued kicking toward defendants and threatened to spit on them. *Id.* Ortiz dropped and placed his knee across Kuznetsov's chest. Ortiz Decl. ¶ 5. Carlson called "staff assault" over the radio, and Carlson and Bartell each administered a two- to three-second burst of oleoresin capsicum (OC) spray towards Kuznetsov's face, and a spit mask was applied to her head. Ortiz Decl. ¶ 5; Bartell Decl. ¶ 6.; Carlson Decl. ¶ 7. Carlson attempted to use Kuznetsov's "hypoglossal notch to stand [her] to [her] feet," but she continued to refuse to walk and resisted defendants attempts to get her to stand. Carlson Decl. ¶ 7.

Having heard Carlson's radio announcement, defendant Zamarripa arrived at the incident scene. Zamarripa Decl. ¶ 5, EFC No. 24. Zamarripa saw Carlson and Bartell struggling with Kuznetsov and retrieved a humane wrap.[3] *Id.* ¶¶ 6-7. When Zamarripa returned, Bartell, Carlson, and Ortiz began placing Kuznetsov into the humane wrap, and Kuznetsov kicked out at Bartell. Carlson Decl. ¶ 8; Zamarripa Decl. ¶ 8. In response, Carlson twisted Kuznetsov's ankle restraints and Zamarripa placed his right knee on Kuznetsov's chest and face area, and both officers gave

---

[3] A "humane wrap" is a device sometimes employed to regain control of an AIC; once and AIC is inside the humane wrap, their body movement is limited, giving prison staff an opportunity to gain control. Zamarripa Decl. ¶ 6.

Page 5 – OPINION AND ORDER

direct orders to stop resisting. Carlson Decl. ¶ 8; Zamarripa Decl. ¶ 8. Once Kuznetsov was restrained in the humane wrap, the officers carried her to a holding cell. Carlson Decl. ¶ 8. Once Kuznetsov was in the holding cell, Bartell notified medical staff. Rabb Decl. Ex.2 at 12, ECF No. 24.

Defendants submitted surveillance footage of the incident. Because the camera was stationed at the end of a cell block corridor and most of the incident occurred in a stairwell just off the corridor, few details can be seen. Rabb Decl. Ex. 3, EFC No. 29, 44. The video shows defendants securing Kuznetsov in the humane wrap because the top half of the humane wrap extended into the corridor. Kuznetsov can be seen for about five seconds as officers initially maneuvered her in the humane wrap and one moment of Kuznetsov struggling and extending her legs in a kicking motion from a bent position. In the remaining 60 seconds it took defendants to secure Kuznetsov, footage appears to show Zamarripa lowering his knee near Kuznetsov's chest and face area, after which Kuznetsov stops thrashing. Defendants are then seen carrying Kuznetsov away to the holding cell.

On the same day as the incident, Captain Bobby Rabb investigated what had occurred and prepared an Oregon Department of Corrections (ODOC) Unusual Incident Report (Incident Report). *See* Rabb Decl. Ex. 2 at 3-5, ECF 24. The Incident Report states that, shortly after officers brought Kuznetsov to the holding cell, she was removed from the humane wrap and secured to the wall restraint so that Health Services could assess her condition. *Id.* Kuznetsov was "monitored continuously for more than the required 30 minutes with no complications noted." *Id.* at 4. Kuznetsov was also provided with damp cloths and clean clothing, and she was offered a decontamination shower, which she declined. *Id.* No staff reported injuries. *Id.* Photos

Page 6 – OPINION AND ORDER

of Kuznetsov were also taken and submitted as part of the Health Services' incident report, noting that Kuznetsov had an irritation to her left eye, skin abrasions on her back, and a reddish stomach abrasion.[4] *Id.* Ex. 2 at 4, 11. No other injuries were noted. *Id.* Captain Rabb's investigation concluded that Bartell, Carlson, Zamarripa, and Ortiz complied with ODOC's use-of-force rules. See Rabb Decl. ¶ 8, ECF 24.

## LEGAL STANDARDS

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2019). The moving party must establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party establishes the absence of a genuine issue of material fact, the nonmoving party can only defeat summary judgment by going beyond the allegations in the complaint to demonstrate a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, unsupported conjecture, or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

---

[4]   In her response, Kuznetsov claims that she was bleeding out her nose and that a tooth was cracked during the incident, and later was removed. Pl.'s Resp. at 2-3, ECF No. 27; Pl.'s Am. Resp. at 2-3, ECF No. 41. The medical records and photographs in Rabb's investigation do not mention a cracked tooth or show that Kuznetsov was bleeding. Rabb Decl. Ex. 2 at 11.

Page 7 – OPINION AND ORDER

To determine whether summary judgment is proper, the court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. "Mere allegations or denials" are insufficient to meet the nonmoving party's burden to show a genuine issue of material fact to defeat a motion for summary judgment. *Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

The court construes a *pro se* litigant's filings liberally. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A *pro se* party involved in civil litigation, however, is held to the same standards in responding to a motion for summary judgment and "should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir. 1986); *see also Warden v. Robinson*, 2014 WL 252308, at *5 (D. Ariz. Jan. 23, 2014) ("A *pro se* litigant is held to the same standard in responding to a motion for summary judgment as a represented party."). Additionally, "[i]t is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N.R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex*, 477 U.S. at 324). Therefore, when a plaintiff makes assertions but does not identify specific evidence in the record to support those assertions, the court is not required to search for it. See *F.T.C. v. Stefanchik,* 559 F.3d 924, 929 (9th Cir.

2009) (citation omitted) ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment.").

## DISCUSSION

Defendants argue that they are entitled to summary judgment on Kuznetsov's excessive-force claim because there is no genuine issue of material fact as to whether defendants applied force in a good-faith effort to maintain and restore discipline. Mot. 2, ECF 24. Defendants argue that they are also entitled to summary judgment on Kuznetsov's failure-to-intervene claim because Ortiz had no duty to intervene where defendants did not use excessive force against Kuznetsov. *Id.*

### A.     *Excessive Force Claim*

The unnecessary and wanton infliction of pain violates the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). Where a plaintiff alleges that correctional officers used excessive force against him, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam); *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013). The standard has both objective and subjective elements. Objectively, the alleged wrongdoing must be "harmful enough to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted). Subjectively, prison officials must act "with a sufficiently culpable state of mind" *id.*, but an "express intent to inflict unnecessary pain is not required." *Whitley v. Aiders*, 475 U.S. 312, 319 (1986) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To determine whether a particular

use of force evinces the wanton infliction of pain, "we consider the objective need for force, the relationship between any such need and the amount of force actually used, the threat reasonably perceived by the correctional officer, whether the officer took efforts to temper the severity of his response, and the extent of the inmate's injury." *Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir. 2003); *see Boyd v. Cnty. of Riverside*, No. EDCV1301282JVSDTB, 2016 WL 11755423, at *12 (C.D. Cal. Sept. 7, 2016), *adopted* 2016 WL 11755592 (Oct. 27, 2016) (listing factors and citing *Hudson*, 503 U.S. at 7).

      Starting with the force used, the parties agree that Carlson and Bartell deployed OC spray against Kuznetsov and that Zamarripa placed his knee onto Kuznetsov's chest and face area. Kuznetsov claims she was also "hit in the head multiple times" by Carlson and Bartell and says that she turned her "body and face away from the punches and kicks" and was "slammed onto the ground" with enough force to lose consciousness. Compl. 4-5. Kuznetsov offers no proof that such actions occurred, and there are no medical records that could substantiate her claims that she "blacked out" or suffered a cracked tooth after being "kick[ed] or kneed" in the face. Resp. 3, ECF 41. In fact, the brief video of the incident shows that Kuznetsov was fully conscious when the officers applied the humane wrap to her body. *See* Rabb Decl. Ex. 3, ECF 44. Moreover, the Chemical Agent Deployment Form for the incident shows that Kuznetsov was assessed by Nurse Bevan shortly after she was brought to the holding cell and was immediately provided with decontamination supplies; the incident report further notes that Kuznetsov was "monitored continuously for more than the required 30 minutes with no complications noted" after she was brought to the holding cell. Rabb Decl. Ex. 2 at 4, ECF 24. In light of this unrefuted evidence, no reasonable jury could find Kuznetsov's alleged injuries credible.

Regarding the need for the force used, Kuznetsov argues that defendants' use of force was "planned and malicious" but she offers no evidence to support that assertion. There is also nothing in the record that suggests defendants were motivated by personal animus or wanted to harm Kuznetsov, despite Kuznetsov's claim that defendants' use of force was retaliation for Kuznetsov's assault on a different officer two days before this incident. Resp. 3. Instead, the evidence shows that Kuznetsov precipitated the incident when she became "combative" about the denial of her access to exercise equipment, sat down in protest, and refused to stand or return to her cell despite multiple commands from Bartell and Carlson to do so. *See* Bartell Decl. ¶ 5, ECF 24; Carlson Decl. ¶¶ 5-6, ECF 24. Although Kuznetsov contends that it was Carlson who became verbally and physically "combative" and not her, she acknowledges that she requested specific workout equipment, and she states that she "refused to proceed" and "refuse[d]" to stand up after Carlson "started challenging" her. Resp. 1-2, ECF 41. Courts recognize this type of physical noncompliance as a security risk for all involved. *See Boyd*, 2016 WL 11755423, at *12 (noting that, "[a]n inmate refusing to comply with orders presents a threat to the safety of other inmates and prison security"); *see also Grigsby v. Munguia*, No. 2:14-cv-0789 GEB AC P, 2016 WL 900197, at *18 (E.D. Cal. Mar. 9, 2016), *adopted* 2016 WL 1267910 (Mar. 31, 2016) ("When an inmate refuses to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.") (Simplified).

Despite Kuznetsov's confrontational actions, defendants refrained from the use of force until Kuznetsov escalated the situation by striking out at the officers with her feet. Kuznetsov insists that she never made "a[n] aggressive move or any attempt to assault staff," Resp. 4, and

she points out that it would have been difficult to do so given that she was handcuffed and had her ankles shackled. *Id*. at 8. However, Carlson attests that Kuznetsov kicked him in the leg, which Bartell and Ortiz both corroborate, and Bartell describes Kuznetsov kicking him in the arms and legs, which Captain Rabb confirmed in his Incident Report. See Carlson Decl. ¶ 6; Bartell Decl. ¶ 6; Ortiz Decl. ¶ 5; Rabb Decl. Ex. 2 at 4 (noting that Kuznetsov "kicked Sgt. Carlson and Sgt. Bartell"). Moreover, the limited video of the incident captures Kuznetsov on her back with her knees bent against her chest and shows her kicking her feet out with force. See Rabb Decl. Ex. 3, ECF 44. The video does not depict Kuznetsov striking anyone with her feet, but it does show that she was capable of doing so, even with her ankles shackled. *See id*. On this record there can be no genuine dispute as to whether Kuznetsov kicked defendants.

When Kuznetsov struck Carlson and Bartell with her feet, Carlson called "staff assault" over the radio, and he and Bartell both deployed a blast of OC spray at Kuznetsov's facial area for 2-3 seconds to gain her compliance. Although deploying pepper spray is an application of force, a "plaintiff's active resistance and physical assault upon the officers—combined with the immediate threat to officer, inmate, and institutional safety—render[s] the use of significant force both necessary and reasonable under the circumstances." *Boyd*, 2016 WL 11755423, at *14 ("The degree of resistance is relevant to the amount of force that is reasonable."); *see also Taylor v. San Bernardino Cnty. Sheriff's Dep't*, Case No. EDCV 14-1190-AG (JEM), 2017 WL 2789502, at *6-7 (C.D. Cal. Mar. 31, 2017), *adopted* 2017 WL 2784832 (June 27, 2017) (finding officers reasonably deployed OC spray to gain compliance and avoid a forced cell extraction after inmate repeatedly refused to comply) (citing *Stewart v. Stewart*, 60 F. App'x. 20, 22 (9th Cir. 2003)).

Page 12 – OPINION AND ORDER

In *Boyd*, the corrections officers used verbal commands to remove the plaintiff from his cell, and when the plaintiff refused to comply, the officers "swarmed" his cell and they grabbed, pulled, and knocked him to the floor. *Boyd*, 2016 WL 11755423, at *11. In response, the plaintiff "began yelling, pushing, and fighting the officers off of him," and the officers responded with more force in the form of punching, kneeing, and hogtying the plaintiff. *Id*. at *11. The court found that the "plaintiff's decision to resist the officers' efforts to restrain him and to actively assault the officers created the need for the application of additional force to subdue plaintiff." *Id.* at *12. Thus, the officers' actions did "not give rise to an inference of a culpable mental state and, instead, suggest[ed] that [the defendants] applied force for the good faith purpose of maintaining order and restoring discipline." *Id*. at *11.

Like the plaintiff in *Boyd*, Kuznetsov's recalcitrance created a security situation when she refused to stand up and ignored defendants' multiple commands to return to her cell, and she directly threatened officer safety by striking at Carlson and Bartell with her feet. *See id.* at *12-13. Under these circumstances, defendants "reasonably perceived plaintiff as posing a threat not only because [she] . . . refused to respond to verbal commands, but also because of [her] assaultive response." *Id*.; *see also* Henderson v. Lamarque, No. C 00-4664 VRW, 2002 WL 1300271, at *3 (N.D. Cal. June 6, 2002) ("[D]efendants reasonably perceived a significant threat after plaintiff refused to comply with orders and struck Officer Esparza[.]"). As the court found in *Boyd*, "[o]n these facts, the force that [was] . . . applied was neither unreasonable nor indicative of a malicious and sadistic intent solely to harm plaintiff." *Id*. It is likewise clear that "plaintiff [herself] created the reasonably-perceived need for force and defendants responded

with a proportionate amount of force to neutralize the threat that plaintiff created and to gain [her] compliance." *Boyd*, 2016 WL 11755423, at *13.

Further, when the OC spray failed to stop Kuznetsov from continuing to assault Bartell, it was reasonable for Zamarripa to briefly place his knee across Kuznetsov's chest and face area as a further effort to "gain control of the situation." *See* Zamarripa Decl. ¶ 8, ECF 24. Although there may have been less painful alternatives available to Zamarripa, there is no evidence that Kuznetsov sustained any serious injury, and courts recognize that "safety and order at these institutions requires the expertise of correctional officials who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 566 U.S. 318, 326 (2012). Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

In short, the unrefuted evidence of Kuznetsov's noncompliance and physical aggression makes it clear that Carlson and Bartell used force "in a good faith effort to restore discipline and order" and not to harm Kuznetsov. *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002) (quoting *Whitley*, 475 U.S. at 320-21). Even considering the evidence in the light most favorable to Kuznetsov, no reasonable jury could find that defendants applied force "'maliciously and sadistically for the purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 320-21); *see Fudge v. Bennett*, Case No. 2:19-cv-01102-SB, 2022 WL 4227423, at *7 (D. Or. Sept. 2, 2022), *adopted* 2022 WL 4216941 (Sept. 12, 2022), *appeal filed* (9th Cir. Sept. 14, 2022) (stating malicious and sadistic force under the Eighth Amendment requires a more culpable mental state than that required for excessive force claims under the Fourth Amendment). Defendants are

therefore entitled to summary judgment on Kuznetsov's excessive force claim. *See Charlton v. Yepez*, No. 2:16-CV-00901-MC, 2019 WL 2648801, at *5 (D. Or. June 27, 2019) (rejecting the plaintiff's claim that the defendant officer "provoked" or "baited" him into a physical altercation for the purpose of deploying pepper spray against him and granting the defendant summary judgment on a claim of excessive force).

B.  *Failure to Intervene Claim*

Kuznetsov's second claim alleges that Ortiz violated her rights because he "stood by and did nothing and said nothing as I was assaulted." Compl. 4, ECF 2. The court understands Kuznetsov to be asserting a failure to intervene claim. *See Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (stating that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene"); *McGruder v. Los Angeles Cnty. Sheriff's Dep't*, No. CV 17-7024-CJC (JPR), 2018 WL 6137626, at *5 (C.D. Cal. Jan. 26, 2018) ("A jail officer who does not himself use force may be liable for a constitutional violation if he has a reasonable opportunity to intervene in other officers' use of excessive force but does not do so."). However, as discussed above, the record shows that defendants did not use excessive force against Kuznetsov. Thus, Ortiz had no reason to believe that the other defendants were violating Kuznetsov's constitutional rights.

Because no reasonable jury could find defendants used excessive force against Kuznetsov, no reasonable jury could find that Ortiz violated her rights by failing to intervene. *See Harbert v. Miller*, No. 2:18-CV-00072-YY, 2019 WL 3754907, at *5 (D. Or. Aug. 8, 2019) (granting the defendants summary judgment on a failure to intervene claim "because the cell

extraction team acted with a reasonable amount of force, the named defendants had no reason to intervene"). Ortiz is therefore entitled to summary judgment.

## CONCLUSION

For all these reasons, defendants' Motion for Summary Judgment (ECF No. 24) is GRANTED.

IT IS SO ORDERED.

Dated October 6, 2022.

                                                                                  JEFFREY ARMISTEAD
                                                         United States Magistrate Judge